**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**THE FILTA GROUP, INC.,**

          **Plaintiff,**

**v.**                          **Case No: 6:25-cv-914-PGB-NWH**

**LXU, LTD., KENNETH MELICK,**
**KITCHEN KARE**
**INNOVATIONS, LLC and**
**SHANE FARRER,**

          **Defendants.**

_____/

## ORDER

This cause is before the Court on the Plaintiff's Renewed Motion for Preliminary Injunction. (Doc. 29). The Defendants submitted a Response in Opposition (Doc. 57)[1], and the Court presided over an evidentiary hearing regarding the Motion on December 18–19, 2025. Upon consideration, the Plaintiff's Renewed Motion for Preliminary Injunction is granted.

## I.    FINDINGS OF FACT

### A.    The Franchise Agreement

The Filta Group offers franchises, including FILTAFRY®, which involves microfiltration of used cooking oils using a Mobile Filtration Unit ("**MFU**"). (Doc. 29-1, ¶ 2). The MFU bears Plaintiff's trademarks. (*Id.* ¶¶ 3–4). The Plaintiff's

---

[1] Rather than attaching the Declarations of Kenneth Melick and Shane Farrer to their response, the Defendants filed the Declarations as separate documents. (*See* Docs. 57, 58, 59).

franchisees can also market FILTACLEAN®, which offers cleaning and sanitizing of commercial kitchen surfaces. (*Id.* ¶ 6). Filta franchisees operate the MFUs from vans that are specially equipped and bear the Filta Mark. (*Id.* ¶ 5). It is undisputed that Plaintiff has extensively employed and advertised its Marks throughout the United States.[2] (*Id.* ¶¶ 17–18).

Defendant Ken Melick is the owner of Defendant LXU, Ltd. ("**LXU**"). (*Id.* ¶ 7). Mr. Melick executed a Franchise Agreement with Plaintiff on January 9, 2014. (*Id.* ¶ 7; Plf. Ex. 2). Whenever a franchisee offers another Filta service to a customer, the franchisee signs a Franchise Agreement Addendum. (Doc. 29-1, ¶ 8). Defendants Melick and LXU (collectively, the "**Franchisees**") operated a franchised Filta business in Ohio, Indiana, and Kentucky (collectively, the "**Territories**") using the MFU system and Marks. (*Id.* ¶ 10). The Franchisees were required to operate the franchised business continuously during the term of the Franchise Agreement. (*Id.* ¶ 12). Defendant Melick also guaranteed LXU's performance to Filta and its adherence to the Franchise Agreement's non-compete and non-solicitation provisions. (Plf. Ex. 2, p. 33, §§ 23.1–23.5). The franchisee is also prohibited from providing financing, other assistance, or facilities to any business that competes with Filta. (Plf. Ex. 2, § 23.1). Defendant Melick testified that, as a Filta franchisee, he knew which services were being provided to

---

[2]    A comprehensive list of Plaintiff's Marks is set forth at Docket Entry 29-1 in paragraphs 17–18. Defendants KKI and Farrer infringed Plaintiff's Marks in other ways, including Mr. Farrer's LinkedIn page identifying him as Director of Operations at The Filta Group, Inc. – USA. (Plf. Ex. 45). Defendant Farrer's LinkedIn page was not changed until the second day of the hearing.

customers, when the services were scheduled, and the amount paid by each customer. He obtained this information from Filta's inside sales department.

Filta took steps to protect its confidential and proprietary information. The Franchise Agreement prohibits the Franchisees from transferring or selling the MFUs. (Doc. 29-1, ¶¶ 24–25; Plf. Ex. 2, § 8.1). Filta had the right to inspect a franchisee's business, including its books and records, vans, and MFUs, and could direct a franchisee to provide a list of its customers. (Doc. 29-1, ¶¶ 27, 28). To protect its proprietary information, franchisees were required to obtain signed confidentiality and/or non-compete agreements from their employees. (*Id*. ¶ 32; Plf. Ex. 2, §§ 13.3, 17.2, 23.6). If the Franchise Agreement expires or is terminated, the franchisee is required to sell its MFUs to Plaintiff and cooperate in transitioning customers back to the Plaintiff. (Plf. Ex. 2, §§ 22.1–22.10).

## B.    The Formation of KKI

Defendant Farrer testified at the evidentiary hearing. Defendant Farrer formed Kitchen Kare Innovations ("**KKI**") on October 1, 2024, with the assistance of Mr. Li, counsel for the Franchisees. Before founding KKI, Defendant Farrer was employed by LXU, where he began as a technician and eventually rose to the position of Chief Operating Officer. Defendants Farrer and Melick, as well as Mr. Li, maintain offices at the same physical address. Defendant Farrer attended conventions while employed by LXU and gained knowledge of fryer management during his eight-year tenure. Defendant Farrer also learned which customers LXU serviced under the Filta franchise and the amounts charged for those services.

Defendant Melick never asked Defendant Farrer to sign a confidentiality agreement.

Although Defendant Farrer is not a signatory to the Franchise Agreement, on March 25, 2025, he received a cease-and-desist letter from the Plaintiff's counsel. (Plf. Ex. 22). Counsel advised Defendant Farrer that under § 8.6.9 of the Franchise Agreement, LXU is prohibited from competing with Filta and from using confidential information obtained during the term of the Franchise Agreement. Defendant Farrer was also instructed that the Franchise Agreement prevents a franchisee from circumventing the non-competition clause by acting indirectly through any other person or entity (*Id*.). Defendant Farrer testified that he showed this letter to Mr. Li, who later assisted him in drafting correspondence soliciting business from LXU customers.

### C.    The Conspiracy

On September 18, 2024, Defendant Melick applied to become a distributor for Ceiling Pro International, a company that sells cleaning chemicals. (Plf. Ex. 62). In the application, Defendant Melick identified his company as "LXU ltd dba Filta Environmental Kitchen Solutions." (*Id*.). Two weeks later, Ceiling Pro invited Defendant Melick to a training event. (Plf. Ex. 63). Defendant Farrer accompanied him on this trip. On September 27, 2024, the Plaintiff learned about the upcoming conference and reminded Defendant Melick that he was required to sign an addendum to the Franchise Agreement before he could provide these services. (Plf. Ex. 18). Defendant Melick never signed the addendum. Instead, on October 1,

4

2024, Defendant Farrer, with the help of Mr. Li, formed KKI, ostensibly to provide ventilation hood cleaning services. Defendant Melick loaned Defendant Farrer $17,500 to secure a Ceiling Pro distributorship, knowing that the Plaintiff was forging a relationship with Ceiling Pro to grow Plaintiff's kitchen cleaning services. (Plf. Ex. 18).[3]

Leading up to May 16, 2025, LXU had received several default notices from the Plaintiff. (Plf. Exs. 15, 24–27, 29). Defendant Melick testified on the second day of the evidentiary hearing and admitted that on April 29, 2024, the Franchisor requested a complete customer list (Plf. Ex. 15), and he did not comply as required by the Franchise Agreement. Defendant Melick also conceded that he violated the Franchise Agreement by failing to have employees sign confidentiality agreements, performing work outside of his designated territory, and denying Filta access to his books, records, and facilities. (Plf. Exs. 25, 26, 28, 29).

On May 16, 2025, without providing Filta prior notice, the Franchisees unilaterally terminated the Franchise Agreement and sent a letter, using the Filta Mark, to every customer. (Plf. Ex. 33). The letter was sent to customers on Friday, May 16, 2025, and informed them that LXU would no longer provide fryer management services. (*Id.*). Defendant Melick told these franchise customers that he had "already reached out to alternate service vendors to secure their agreement

---

[3]   Defendants KKI and Farrer contend that Defendant Melick's loan does not violate the Franchise Agreement's prohibition on financing a competitor because Filta was not yet offering kitchen cleaning services. This may be true, but evidence that Defendant Melick financed Defendant Farrer's newly formed business sets the stage for what comes next.

to provide you with uninterrupted fryer management services *under the same terms* as you've been getting from LXU." (*Id.* (emphasis added)). Defendant Melick stated that "**[a] representative from one of these vendors will reach out directly to you today to establish service.**" (*Id.*).

In reality, only one vendor was on deck to replace LXU. Minutes after Defendant Melick cut ties with Filta and left his franchise customers without a vendor to service their fryers, Defendant Farrer sent a letter drafted by Mr. Li to the same Filta customers. (Plf. Ex. 34). Using Filta's proprietary client list, Defendant Farrer introduced himself and offered to provide the "same services under the same terms and conditions as you previously received" from LXU. (*Id.*). Defendant Farrer sweetened the deal by offering "a special opportunity to receive a discount in exchange for executing a new service agreement with [KKI]." (*Id.*). Defendant Farrer testified that he knew how much each customer was paying for fryer services, having worked for LXU. Seven minutes before LXU sent its cessation-of-services letter to Filta customers, Mr. Li provided LXU's employees and Defendants Melick and Farrer instructions on how to back up their Filta Gmail and Filta files stored on Google accounts. (Plf. Ex. 31).

According to Defendant Farrer, KKI provided hood cleaning services before May 16, 2025. That said, KKI was a fledgling operation with 5 employees: two sales representatives, two service representatives, and Defendant Farrer. (*See* Plf. Ex. 78). To service the 450 Filta customers who received Defendant Melick's cessation of services letter, KKI needed an infusion of equipment and personnel; Defendant

Melick provided both. The testimony established that Defendant Melick transitioned all of LXU's employees, its vans equipped with MFUs, and the warehouses used by LXU to KKI. (*See also* Plf. Ex. 91). Following this transition, KKI grew to 41 employees. (Plf. Ex. 81). Defendant Melick continued to pay employees formerly employed by LXU from the "transition" through August 2025. Defendant Farrer lacked sufficient income or assets to secure financing, so Defendant Melick kept the equipment, including vehicles, in his name, and Defendant Farrer agreed to repayment terms.[4]

The net effect of Defendant Melick's termination of the Franchise Agreement and the cessation of services letter to Filta's customers was to provide KKI and Defendant Farrer with immediate access to 450 customers to whom KKI hoped to upsell hood cleaning services. Furthermore, the transfer of employees and equipment from LXU to KKI was not designed to transfer LXU's debt to KKI, as Defendant Melick contends in his declaration and testimony. Defendant Melick testified that he transitioned his employees and equipment to KKI to buy time to determine how to either dispose of the assets at the end of the lease agreement or relocate them to places where he would not be in violation of the non-compete clause. That is, Defendant Farrer and KKI served as a place holder to maintain customers while LXU and Defendant Melick found a way to circumvent the non-

---

[4]    LXU and Defendant Melick breached the Franchise Agreement by failing to comply with § 2. (Plf. Ex. 2). The Defendants failed to deliver to Filta all MFUs in their possession or control, failed to provide contact details for all customers, and did not cooperate in the transition of the servicing of customers to Filta or its designee. (Plf. Ex. 2, §§ 22.3, 22.7, 22.10).

compete clause. Ultimately, KKI retained 150 LXU customer accounts, growing its business at least threefold.[5]

## II.    LEGAL STANDARDS

A plaintiff is entitled to preliminary injunctive relief upon establishing: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp.*, 147 F.3d at 1306. A preliminary injunction is an extraordinary remedy that should only be entered upon the movant establishing each of the four requisite elements. *Id.*

## III.    DISCUSSION

Filta argues that it is entitled to an injunction on its breach of restrictive covenant claim and its trademark infringement-based claims. The Court agrees and grants a preliminary injunction as to both counts.

---

[5]    Defendant Melick testified that he received the first notice of default by Filta on March 25, 2025, for helping Defendant Farrer set up KKI which offers services similar to Filta. (Plf. Ex. 23). Defendant Melick asserts his refusal to cure subsequent notice of default was motivated by his opinion that Filta was determined to terminate his franchise agreement. However, Filta's motive in issuing the notices of default is irrelevant to LXU's duty under the Franchise Agreement. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir. 1998).

A.    **Trademark Infringement**

1.    *Filta is Substantially Likely to Succeed on the Merits of its Infringement-Based Claims*

Filta brings its first claim for injunctive relief under the Lanham Act. "The Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Off., Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1314 (2d Cir. 1987). "[A] terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement." *Burger King Corp. v. Majeed,* 508 F. Supp. 994, 1002 (S.D. Fla. 1992).

Section 2.1 of the Franchise Agreement limits the Franchisees right "to use the [Marks] and System solely in connection with the operation of the Franchise." Likewise, Section 8.9.1 states:

> You may use the Proprietary Marks only in connection with the Franchise. You may not, without Filta's prior written consent, register any company name or trademark or make use of any business name incorporating any of the Proprietary Marks or incorporating any similar sounding name.

The Franchise Agreement also states that upon the termination of the Franchise Agreement, terminated franchisees must stop using the Marks. Specifically, Section 22.1 states that:

> Immediately upon expiration or termination of this Agreement by either party for any reason or the Transfer of the Franchise to a new owner, unless otherwise explicitly directed by Filta, You must:

> 22.1 cease to trade under the Proprietary Marks, and cease to use the Proprietary Marks (or any imitation or approximation thereof) on the Van, Stationary, signs, uniforms or otherwise[.]

Filta submitted evidence at the preliminary injunction hearing that there has been consumer confusion in the oil delivery and oil filtration marketplace as a result of Defendants continuing to operate an oil delivery and filtration business using Filta's Marks. For example, Defendants' employees have continued to visit Filta's customers wearing uniforms bearing Filta's trademarks, pretending to be offering products and services under the Filta brand. In reality, however, those individuals work for Defendants and issue invoices directing that payment be made to KKI. (*See* Plf. Ex. 30).

After reviewing all of the evidence and hearing testimony, the Court finds that Filta carried its burden in demonstrating that there has been a likelihood of consumer confusion in the marketplace as a result of Defendants' actions. As such, this Court finds that Filta is substantially likely to prevail on its trademark infringement-based claims.[6] (*See* Plf. Exs. 37, 39).

2.    *Defendants' Continuing Infringement of Filta's Marks will Irreparably Injure Filta*

As an initial matter, based on the Trademark Modernization Act of 2020, Filta is entitled to a rebuttable presumption of irreparable harm. *See* 15 U.S.C. § 1116(a) (stating that "[a] plaintiff seeking any such injunction shall be entitled to a

---

[6]    The Court likewise finds that Defendants' infringement of Filta's trademark also constitutes a breach of the Franchise Agreement by the Franchisees.

rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction"); *Hammer Brand, LLC v. Voro, Inc.*, No. 23-1272, 2024 WL 5430594, at *12 (M.D. Fla. Dec. 20, 2024) (stating that "[o]nce infringement is established, a plaintiff is entitled to a rebuttable presumption of irreparable harm"). Here, given that Filta has established a likelihood of success on its claims against Defendants, it is entitled to a rebuttable presumption of irreparable harm.

Even without the presumption of irreparable harm, which Defendants have not rebutted, given the strong likelihood of consumer confusion and Filta's substantial likelihood of success on the merits, Filta has met its burden of demonstrating that it will suffer irreparable injury if Defendants' actions are allowed to continue. *See Sundor Brands, Inc. v. Borden, Inc.*, 653 F. Supp. 86, 93 (M.D. Fla. 1986) ("The law is settled that the existence of a likelihood of confusion constitutes irreparable injury, as a matter of law, sufficient to satisfy the requirements of Fed. R. Civ. P. 65.").

   3.   *The Threatened Injury to Filta Outweighs Any Threatened Harm to Defendants*

The threatened harm to Filta outweighs any harm Defendants may suffer from the granting of injunctive relief. Defendants' self-inflicted harm in choosing to continue to operate in the cooking oil delivery and filtration industry after the

termination of the Franchise Agreement is outweighed by the damage done to Filta by the infringement of its marks. *Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp 1553, 1561–62 (M.D. Fla. 1988).

### 4. *The Injunction will not be Adverse to the Public Interest*

Lastly, the relief Filta requests is not adverse to the public interest. Consumers, including restaurants, stadiums, arenas, casinos and caterers, rely upon the Filta Marks in doing business with Filta franchisees. They are then deceived into giving Defendants their business under the mistaken belief that they are a legitimate Filta franchisee. Granting injunctive relief to Filta will in fact serve the public interest by preventing consumer confusion.

### B. The Restrictive Covenants

### 1. *Florida Law Controls*

Filta seeks to enforce restrictive covenants that prevent Defendants from soliciting Filta's customers or operating in the same industry as Filta, as specified in Sections 23.2 and 23.3 of the Franchise Agreement. Section 30.1 of the Franchise Agreement states that "[t]his Agreement is governed in all respects in accordance with the law of the State of Florida, without regard to the application of Florida conflict of law rules." Accordingly, Florida law governs the enforcement of the restrictive covenants.

2.  *Filta is Substantially Likely to Succeed on its Claim to Enforce the Restrictive Covenants*

Sections 23.2 and 23.3 of the Franchise Agreement contain post-term restrictive covenants against competition and solicitation as follows:

> 23.2 For 2 years following the . . . termination . . . of this Agreement . . . [LXU] may not, without Filta's prior written consent, own, operate, be employed by, provide financing or other assistance or facilities to, or have any interest in, any Competing Business[7] that is operating within any Territory formerly assigned to [LXU] or within the geographic area defined by an outer boundary line that is measured twenty-five miles outward from the perimeter of any Territory formerly assigned to [LXU] . . . [LXU] acknowledge[s] that its purpose is to protect the goodwill of Filta and its other franchisees.
>
> 23.3 For 2 years following the . . . termination . . . of this Agreement . . . [LXU] may not have any contact with any customers to which [LXU] provided services within the 1-year period before . . . termination . . . for the purpose of soliciting such customers for any Competing Business at any location.

Defendant Melick expressly agreed to abide by the restrictive covenants in the Guaranty, which is included in the Franchise Agreement. FILTA is substantially likely to succeed on its claim for breach of the restrictive covenants because those covenants are in place to support legitimate business interests.

Florida law determines whether a restrictive covenant is appropriate based on its scope and breadth. Under Florida law, a non-compete agreement is enforceable if it seeks to protect "one or more legitimate business interests." FLA. STAT. § 542.335(1)(b). First, Filta has a legitimate business interest in protecting

---

[7] The Franchise Agreement defines "Competing Business" as "any business that offers services similar to those provided by the Franchise."

its marks and the goodwill associated with those marks in the Territories where Defendants have continued to operate in the oil delivery and filtration industry. Second, Filta has a legitimate business interest in preventing Defendants' unauthorized use of confidential information obtained through the franchise relationship, including valuable information about Filta's customers, such as their identities, ordering needs and habits, and pricing. Third, Filta has a legitimate business interest in protecting customer goodwill associated with Filta. Finally, without an injunction, Filta will be unable to re-franchise the Territories, as Defendants' competing business will make it more difficult or impossible to sell the Territories to a replacement franchisee. These are all legitimate business interests sufficient to support the entry of a preliminary injunction to enforce the Franchise Agreement's restrictive covenants.

Moreover, the Court finds that the restrictions in the covenants are reasonable in time, area, and line of business. *See* FLA. STAT. § 542.335(1). The restrictive covenant prevents competitive activity: (1) within the Territory formerly assigned to the Franchisees; and (2) within the geographic area defined by an outer boundary line measured twenty-five miles outward from the perimeter of any Territory formerly assigned to the Franchisees. Further, the two-year duration of the restrictive covenants is a reasonable period to permit Filta a fair opportunity to establish a new franchise within Defendants' prior territories. Thus, the restrictive covenant is narrowly tailored, not overbroad, and reasonably formulated to protect Filta's legitimate business interests. Filta has met its burden

of demonstrating a substantial likelihood of success on the merits of its claim for breach of the restrictive covenants by virtue of Defendants' continued operation of a competitive business in the oil delivery and filtration industry within and around Defendants' former Territories.

Moreover, "Florida courts have not hesitated to enforce non-compete agreements against both the [party] who signed the agreement as well as against the [non-parties to the agreement] through which the corporation conducted business even where the individual was the only signatory to the non-compete agreement." *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1229-30 (M.D. Fla. 2002). Parties "cannot avoid the reach of the non-solicitation agreement by using a straw man." *Id.* In other words, "individuals and entities may be enjoined from aiding and abetting a covenantor in violating a covenant not to compete" and an injunction binds the signatory "but also those identified with them in interest, in privity with them, represented by them or subject to their control." *Dad's Props., Inc. v. Lucas*, 545 So. 2d 926, 928-29 (Fla. 2d DCA 1989) (enjoining parties that were not signatories to non-compete agreement where it was clear that the non-signatories aided and abetted signatories in their intentional violation of the non-compete).

District courts routinely enter preliminary injunctions against terminated franchisees that signed non-compete agreements as well as those with whom the former franchisees have worked in setting up a competing business notwithstanding that the others did not sign a non-compete agreement. *See JTH*

*Tax, Inc. v. Abikarram*, No. 19-60328, 2019 WL 2254816, at *2–*3 (S.D. Fla. Mar. 22, 2019) (enjoining terminated franchisee's wife from operating competing tax preparation business where wife used same facilities as terminated franchisee, wife was servicing customers previously serviced by terminated franchisee, and evidence indicated that wife was being used to aid and abet terminated franchisee's evasion of franchise agreement's non-compete); *Pirtek USA, LLC v. Layer*, No. 05-793, 2005 WL 8159764, at *4–*5 (M.D. Fla. Sept. 23, 2005) (enjoining competing business set up by former franchisee's wife despite the fact that neither competing business nor wife signed franchise agreement containing non-compete); *U.S. Lawns, Inc. v. Landscape Concepts of CT, LLC*, No. 16-929, 2016 WL 9526340, at *7 (M.D. Fla. Oct. 31, 2016) (enjoining competing business set up by franchisee during term of franchise agreement, which was neither a party to the lawsuit or a party to a written non-compete, from violating terms of the former franchisee's non-compete).

Moreover, Federal Rule of Civil Procedure 65(d)(2) makes clear that every injunction order binds "the parties," "the parties' officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation with" those previously described. *U.S. Lawns*, 2016 WL 9526340, at *7. For this reason, as well, an injunction against the Franchisees binds Farrer and KKI, given that Farrer qualifies as LXU's officer, agent, servant, and employee, and that KKI and Farrer are in active concert or participation with the Franchisees. As discussed above, Defendants Melick and LXU acted in concert with Defendants

KKI and Farrer. To allow Defendants to use KKI and Farrer to circumvent the restrictive covenants would render the non-compete clause and non-solicitation clauses unenforceable by use of the simple expedient of performing all solicitations in the name of the corporate non-signatory or through the use of an agent to aid and assist in the violation of the restrictive covenants. *Pirtek*, 2005 WL 8159764, at \*5. Based on the foregoing, KKI and Farrer are clearly subject to the Franchisees' control and conspired with the Franchisees to set up and operate the competing business. As a result, they can be lawfully enjoined.

### 3.    *Filta Demonstrates Irreparable Injury*

"The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." FLA. STAT. § 542.335(1)(j). Thus, Filta has demonstrated irreparable injury arising from Defendants' violations of the restrictive covenant.

### 4.    *The Balance of Harm Weighs in Favor of Filta*

As stated previously, the threatened injury to Filta outweighs any damage Defendants may suffer from the granting of injunctive relief because Defendants' harm in choosing to continue to operate in the subject industry after the termination of the Franchise Agreements is self-inflicted. Defendants cannot now disregard their obligations under the restrictive covenant. The harm to Filta would be substantial if Defendants did not comply with the restrictive covenant because Filta has invested significant time and money developing and establishing its

presence in and around the Territories in connection with the oil sale, delivery and filtration industry.

### 5.    *The Injunction will not be Adverse to the Public Interest*

A preliminary injunction will not be adverse to the public interest because it will encourage parties to adhere to contractual obligations. Moreover, Florida law contemplates the entry of an injunction to enforce reasonably restrictive covenants in franchise agreements. Defendants have not offered any evidence of a public policy interest that substantially outweighs the need to protect Filta's legitimate business interests. *See* FLA. STAT. § 542.335(1)(i). Therefore, the Court finds that Filta is entitled to a preliminary injunction to enforce its restrictive covenant with Defendants.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.    Plaintiff's Motion for Preliminary Injunction (Doc. 29) is **GRANTED**.

2.    Defendants and all persons acting on their behalf, in concert with, or under their control are preliminarily enjoined from:

> (a)    using, manufacturing, packaging, distributing, selling, advertising, displaying, or promoting any product or service bearing any of Filta's trademarks including, without limitation, FILTAFRY® and any variation thereof;

> (b)    holding themselves out as an operator of a Filta franchise or having any connection with Filta or the System; and

(c)    making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants and the products and services provided by Defendants, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Filta.

3.    LXU and Melick, and all persons acting on their behalf, in concert with, or under their control, are preliminarily enjoined from:

(a)    for a period of 2 years commencing on the date of this Order, owning, operating, being employed by, providing financing or other assistance or facilities to, or having any interest in, any business that offers services similar to those previously provided by LXU (a "Competing Business") including, without limitation, fryer cleaning and cooking oil filtration, the sale and delivery of new cooking oil, the collection and/or recycling of used cooking oil and kitchen cleaning within the Territories or within the geographic area defined by an outer boundary line that is measured twenty-five miles outward from the perimeter of the Territories; and

(b)    for a period of 2 years commencing on the date of this Order, having any contact with any customers to which LXU provided services within the 1-year period before May 16, 2025, for the

purpose of soliciting such customers for any Competing Business at any location.

4.   KKI and Farrer, and all persons acting on their behalf, in concert with, or under their control are preliminarily enjoined from:

   (a)   for a period of 2 years commencing on the date of this Order, providing services similar to those previously provided by LXU to any of Filta's customers that were serviced by LXU within the 1-year period before May 16, 2025, including, without limitation, oil cleaning and filtration, the delivery of new cooking oil and kitchen cleaning; and

   (b)   for a period of 2 years commencing on the date of this Order, having any contact with any customers to which LXU provided services within the 1-year period before May 16, 2025, for the purpose of soliciting such customers to provide services similar to those previously provided by LXU to any of Filta's customers that were serviced by LXU within the 1-year period before May 16, 2025.

5.   Defendants and all persons acting on their behalf, in concert with them, or under their control shall:

   (a)   deliver to Filta within 30 days all Mobile Filtration Units in their possession or control;

(b)    deliver to Filta within 10 days all Confidential Information (as
        defined on pages 2 and 3 of the Franchise Agreement) and all
        versions of the Manual in their possession or control and
        Defendants shall not retain any copies of any part of the Manual
        or Confidential Information;

(c)    deliver to Filta within 10 days all FiltaCool filters not in use at
        customer locations;

(d)    deliver to Filta within 10 days all customer lists or other data
        that they collected from customers in connection with their
        Filta business;

(e)    within 10 days cancel any fictitious name filing or similar filing
        and any domain name registrations that associates them with
        Filta, the franchised business or the System;

(f)    deliver to Filta within 10 days: (i) full contact details for all
        customers LXU serviced; and (ii) the names of all other persons
        who have inquired about and/or requested the services of LXU
        within the 12 months before May 16, 2025;

(g)    within 10 days assign to Filta all telephone numbers used by
        LXU and Melick in connection with their franchised Filta
        business;

(h)    within 10 days deliver to Filta all copies of documents
        containing Filta's Confidential Information including, without

limitation, customer information, along with any of the documents obtained from Filta's system after May 16, 2025;

(i)     within 10 days delete and permanently destroy all documents containing Filta's Confidential Information including, without limitation, customer information, along with any of the documents obtained from Filta's system after May 16, 2025;

(j)     within 10 days dismantle the Poly Tanks, oil pump, motor for pump, berm, hoses, fittings, couplings, PVC, ball valves and tank hose utilized in connection with their collecting, storing and selling waste vegetable oil;

(k)     immediately refrain from accessing Filta's systems or using, or providing to others, Filta's Confidential Information including, without limitation, customer information; and

(l)     comply with their ongoing obligations that survive termination of the Franchise Agreement including, but not limited to, Article 17 (Confidential Information) and Article 24 (Indemnification).

6.    Defendants shall file with the Court and serve on Filta's counsel within **fourteen days** of this Order a report, in writing and under oath, setting forth in detail the manner in which Defendants have complied with this Order.

7.    Given Filta's size and financial condition, coupled with the fact that it is extremely likely to prevail on its claims, Filta shall not be required to post a bond.

**DONE AND ORDERED** in Orlando, Florida on December 23, 2025.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties